# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-01203-COA

CARMON SUE BRANNAN                                          APPELLANT

v.

STATE OF MISSISSIPPI                                          APPELLEE

DATE OF JUDGMENT:             07/30/2018
TRIAL JUDGE:                  HON. RICHARD W. McKENZIE
COURT FROM WHICH APPEALED:    GEORGE COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:      MARY LEE HOLMES
                              PAUL HARDIN HOLMES
                              MARCUS ALAN McLELLAND
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                              BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:            ANTHONY N. LAWRENCE
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                  AFFIRMED - 10/20/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., GREENLEE AND McCARTY, JJ.

### WILSON, P.J., FOR THE COURT:

¶1.     In September 2014, William Joel Dixon was found dead in his cell at the George County Regional Correctional Facility (GCRCF).  Dixon had been in jail for a week following his arrest for possession of a controlled substance and other charges.  Dixon was diabetic, but he did not take any insulin while incarcerated.  During his incarceration, Dixon complained that he was unable to breathe, felt weak, and could not keep any foods or liquids down.  In addition, guards found Dixon on the floor of his cell and unable to walk on multiple occasions.  Carmon Brannan, a registered nurse and the highest ranking medical

authority at GCRCF, saw Dixon multiple times in the days before his death. However, she did not send Dixon to a hospital or seek any other medical attention for his symptoms. After Dixon's death, a grand jury indicted Brannan for "misdemeanor manslaughter," i.e., a killing committed "without malice" but by "culpable negligence" during the commission of a misdemeanor. Miss. Code Ann. § 97-3-29 (Rev. 2014). The underlying misdemeanor charged in the indictment was "maltreatment," i.e., a failure to provide sufficient medical attention to an inmate. Miss. Code Ann. § 47-1-27 (Rev. 2015).

¶2. At trial, Brannan maintained that she believed Dixon had been suffering from withdrawals and was detoxing from his drug use. However, the jury found her guilty of manslaughter. On appeal, Brannan argues that her indictment was vague and otherwise defective; that the maltreatment statute is unconstitutionally vague; that the trial judge erred by excluding certain evidence relevant to her defense; that the trial judge erred by admitting a chart summarizing the content of a four-hour surveillance video; that there is insufficient evidence to support her conviction; and that the jury's verdict is against the overwhelming weight of the evidence. We find no reversible error and affirm.

### FACTS AND PROCEDURAL HISTORY

¶3. On September 17, 2014, Captain Joe Apker of the Lucedale Police Department responded to a call about a suspicious car in the parking lot of the Yamato restaurant. Apker found Joel Dixon and his two children in the car. Apker ultimately arrested Dixon for possession of a controlled substance, DUI, and child endangerment, among other things. During the arrest, Dixon told Apker that he was diabetic.

¶4. Dixon was taken to GCRCF. Lieutenant Pam Davis completed Dixon's booking, including a medical intake screening form. Dixon told Davis that he was diabetic and required insulin. Dixon did not appear to Davis to be ill or under the influence of drugs, so she sent Dixon to the general population of the county side of the jail.[1] Davis gave Dixon a copy of the GCRCF handbook, which contained the policies and procedures for the jail, including how to make a sick-call request. Davis placed Dixon's medical screening form in a box to be picked up by nurse Carmon Brannan the following morning.

¶5. On September 18, Brannan called Dixon's mother, Donna Dixon, and asked her to bring insulin, needles, and syringes to the jail for Dixon. Donna testified that Brannan asked whether Dixon was on a regular injection schedule for his insulin. Donna told Brannan that Dixon usually injected himself before he ate. Donna told Brannan that she would get the insulin to the jail as soon as possible. Donna asked her daughter to get some insulin and supplies from a nearby WalMart, and Donna took the insulin and supplies to the jail. A GCRCF employee received the insulin and supplies from Donna.

¶6. Donna testified that Dixon had been a Type-1 diabetic since he was sixteen years old. This meant that Dixon's body did not produce insulin, so Dixon had to give himself insulin, either through a pump or insulin shots. Donna testified that Dixon always had insulin with him and checked his blood sugar regularly. At trial, when Donna was asked whether she specifically told Brannan that Dixon was a Type-1 diabetic, Donna answered that Brannan "knew [Dixon] had to have insulin." Donna did not know the name of Dixon's doctor or

---

[1] GCRCF houses both state and county inmates.

whether he saw a doctor regularly. As far as Donna was aware, Dixon regulated his blood sugar by calculating the amount of insulin he needed based on the amount of carbohydrates he consumed. If Dixon's calculations were off, he would eat a snack or take more insulin to adjust his blood sugar level.

¶7. Ulysses Williams was a nurse at GCRCF at the time of Dixon's death. Brannan was Williams's supervisor. Williams was a licensed practical nurse (LPN), while Brannan was a registered nurse (RN). Brannan was authorized to do certain things, such as patient assessments, that Williams could not do as an LPN. Brannan saw the inmates for medical checks, and Williams completed the paperwork and charts. If Brannan was not at work, Williams was the medical authority at the jail.

¶8. Williams testified that Brannan sometimes cancelled medical appointments that he had scheduled for inmates. Williams complained about this to the warden, and the warden told Brannan to stop cancelling the inmates' appointments. This occurred just before Dixon was incarcerated at GCRCF. Williams testified that the warden's order displeased Brannan. Brannan told Williams, "Everybody doesn't need to go to the doctor. . . . They weren't seeing the doctor in the free world . . . . They weren't taking care of themselves, so they don't need to see them while they're in here." Williams also testified that Brannan had a history of refusing to allow inmates to have prescribed medicines. She said that if the inmate was not taking the medicine in the "free world," he did not need it in jail either.

¶9. Williams explained that when an inmate was booked into GCRCF, an intake officer obtained the inmate's medical history and provided copies to the nurses. Serious conditions

4

like diabetes were red flagged. Williams said that nurses would notify the correctional officers of red-flagged inmates so that the officers would know that the inmate might request (and should be granted) medical treatment or a blood sugar check. Williams did not know whether any officers were told that Dixon was diabetic.

¶10. On September 18, Brannan told Williams that they had a new diabetic inmate, Dixon. At that time, Brannan did not know whether Dixon had insulin with him, and the facility did not have insulin on hand. Williams learned that Dixon had insulin in his car, which had been impounded. Williams asked an officer with the Lucedale Police Department to look for the insulin in the car, and an officer later found the insulin and delivered it to GCRCF.

¶11. Williams told Brannan that officers were looking for the insulin in Dixon's car, and Brannan told him that she had spoken with Donna and that Donna was bringing insulin for Dixon. The next day, Brannan told Williams that she had obtained insulin for Dixon, and Williams saw the insulin in the nurses' office. Brannan also told Williams that Dixon had refused to take the insulin. Williams thought it was strange for an inmate to refuse such an important medicine as insulin, so he asked Brannan if she was sure that Dixon had signed a refusal form. Brannan said yes. Williams saw a refusal form on Brannan's desk that appeared to have been signed, but he did not look at the form carefully or verify that Dixon had signed it. After Dixon's death, no refusal form could be found. Williams testified that it was odd for an inmate to refuse a necessary medicine like insulin but that inmates often refused other medicines.

¶12. Williams stated that a diabetic inmate could request a blood sugar check at any time.

Upon request, the inmate would be taken to the nurse's office, where he could perform a self check. If the inmate needed insulin, the nurse would provide him with the shot, and he could inject himself. The nurses did not actually administer the insulin unless the inmate was unable to do so. Because Brannan and Williams were the only nurses at the jail, they relied in part on the correctional officers to let them know if an inmate needed medical attention. An inmate could also fill out a sick form and leave it outside his cell to notify guards or nurses that he needed medical attention.

### September 22, 2014

¶13.    A few days passed at GCRCF without incident for Dixon. At approximately 12:24 p.m. on September 22, Officer Chaviss Jones was notified that an inmate was "down" in the shower. Jones and Officer Steven Johnson responded and found Dixon on the shower floor. Johnson testified that Dixon was lying half-dressed on the floor and that the showerheads were turned on. Dixon seemed to drift in and out of consciousness, and his speech was slurred and difficult to understand. Dixon told Jones that he was weak, sick, and could not keep any food or liquid down. Dixon had not eaten breakfast or lunch that day. The officers contacted Brannan, and she asked them to bring Dixon to her office. Dixon could not walk, so they put him in a wheelchair and took him to Brannan's office. Jones stood in the doorway and overheard the conversation between Brannan and Dixon.

¶14.    Dixon told Brannan that he was weak and could not eat anything. According to Jones, Brannan responded to Dixon's complaints by asking him "what he was in for." Brannan then looked up Dixon's charges on her computer and told him "he was detoxing." Jones testified

6

that his "past experience" was that if an inmate "came in with drug charges" and Brannan believed the inmate "was detoxing," then Brannan "wasn't going to [do] much after that." According to Jones, Brannan said something to Dixon "about him not taking his insulin earlier that morning," and Dixon "told her that he didn't [take insulin] because he didn't need it because he hadn't been able to eat or drink anything." Brannan then told Dixon that he was just detoxing. According to Jones, Dixon responded by telling Brannan "that he had been in rehab before and had detoxed before and [this] wasn't the same thing, that something was different."

¶15. After Brannan finished with Dixon, she told Jones to move him to the special treatment unit (STU) and put him on a thirty-minute watch. Brannan also told Jones to make sure that Dixon got plenty of food and water. After Jones got Dixon settled in the STU, he brought Dixon a cup of water. However, Dixon immediately threw up after taking a drink. Jones "immediately went back to [Brannan] and advised her of what happened." However, Brannan just told Jones to monitor Dixon and make sure he got food and fluids.

¶16. Brannan's report from this incident notes that Dixon's skin was warm and dry, his blood sugar was 243, his blood pressure was 137/95, his oxygen saturation ("O2") was 93%, and his pulse was 105. She noted that Dixon complained that he could not keep food down and that he had been throwing up. According to the report, Dixon stated that he had not been to a doctor for his diabetes in over a year and that he purchased his insulin at WalMart. Brannan noted that Dixon told her that he had smoked one to two grams of meth each day for the last six months and that he last smoked meth "last Thursday before he got arrested.

7

(4 days ago)."[2]  She also noted that she moved Dixon to the STU for "intake and any problems," that he would be on a thirty-minute watch, and that she would monitor him for further issues.

¶17.   Less than two hours later, at 2:22 p.m, Brannan completed another incident report about Dixon.  This time, Brannan noted that Officer Dianne Erkhart had told her that Dixon was yelling that he could not breathe.  Brannan responded to the STU.  Dixon was sitting on the floor of his cell, yelling over and over that he could not breathe.  Brannan took his vitals: 113 pulse, 147/67 blood pressure, and 95% O2.  His nail beds were pink, and he did not appear to have any shortness of breath.  His skin was warm and dry.  Brannan told Dixon that he was fine and just needed to relax.

¶18.   Two hours later, at 4:30 p.m., Brannan completed another incident report on Dixon.  This time, she noted that Dixon was on his bed in his cell, moaning and groaning, and repeatedly saying that he could not breathe.  Her notes indicate that his O2 was 98% and his pulse was 97.  She was not able to take his blood pressure because he could not keep his arm still.  His skin was warm and dry.

¶19.   Sergeant Tammy Bozeman arrived for her night shift at GCRCF around 5 p.m.  Brannan told Bozeman that Dixon "was a drug addict . . . going through withdrawals" and "not to worry about it."  Brannan did not tell Bozeman that Dixon was a diabetic or that he took insulin.  Around 9:30 p.m., Dixon pushed an alert button in his cell.  Bozeman

_____

[2] Dixon was arrested on Wednesday, September, 17, 2014.  The State argued that the note indicated that Dixon had last smoked meth on September 11, i.e., the "Thursday before he got arrested."  Brannan argued that the note meant that Dixon had smoked meth on the day of his arrest and was simply off by one day.

responded and spoke to Dixon through the door. Dixon told her he did not feel well.

### *September 23, 2014*

¶20.    Around 1 a.m. on September 23, Bozeman took Dixon a cup of coffee. At 1:30 a.m., Bozeman was called to Dixon's cell because Dixon had thrown up "everywhere" in his cell. Bozeman and another officer got Dixon a shower and clean clothes, and while Dixon was in the shower, other employees cleaned his cell.

¶21.    At 2:28 a.m., Bozeman checked Dixon's vital signs. His blood pressure was 128/81 and his O2 was 87%. Bozeman called Brannan, who was off duty at the time, and told her that Dixon had been sick and was throwing up. Brannan told Bozeman that Dixon was just going through withdrawals and would be fine. Brannan told Bozeman that she would check on Dixon in the morning when she arrived for her shift.

¶22.    Around 1:30 p.m., Joani Busby called GCRCF to schedule an interview with Dixon regarding his eligibility for the drug court program. Erkhart went to Dixon's cell to tell him about Busby's call. Dixon was lying on his bed and said that he could not get up because he was sick. Erkhart testified that Dixon's speech was slurred and she could see that he had thrown up "black liquids" on the cell of his floor. Erkhart called Brannan, who came to check on Dixon. After Brannan saw Dixon, she told Erkhart that Dixon was "faking" and that his vitals were "better than probably mine and yours both." Brannan did not complete an incident report for this interaction with Dixon. Because Brannan said that Dixon was fine, Erkhart tried to get Dixon ready for his interview. Other officers had to physically drag Dixon to the shower because he could not walk.

9

¶23. At 2:40 p.m., Brannan completed another incident report for Dixon. She had been called to the STU because Dixon was down in the shower again. When she arrived, Dixon was on his side on the floor of the shower. Dixon again told Brannan that he could not breathe, but she noted that he was talking "nonstop." Brannan's report noted that Dixon's nail beds were pink and immediately refilled, his lips were not blue, and his speech was clear. Dixon stated that he felt dizzy when he sat up. His blood pressure was 133/57, and his respiratory rate was normal. Brannan noted that Dixon was oriented to person, place, and time. Brannan concluded that Dixon was stable and not in any medical distress. She told him to get up and dry off.

¶24. Around 3:15 p.m., Busby called Jones and asked him to bring Dixon to her for his interview. When Jones and other officers went to Dixon's cell, Dixon was lying on his bunk and could not stand up without assistance. The officers had to dress Dixon because he could not dress himself. The officers then had to physically carry Dixon to the booking area. Jones told Erkhart that he could not take Dixon to his interview in his condition.

¶25. Erkhart called Busby back and told her that Dixon could not come to his interview because he could not walk. Busby asked to speak to Dixon, so the officers held Dixon up and Erkhart put the phone to his ear. Busby testified that she could not understand a word Dixon said. According to Erkhart, Dixon was trying to tell Busby that "he was sick" and "needed help." Jones and the other officers then took Dixon back to his cell in the STU.

¶26. Lieutenant Nicole Shultz and Lieutenant Leslie Hodges both testified during Brannan's defense that they were not told about the drug court incident. Hodges testified that

as the Operations Lieutenant, she should have been informed of any issue with an inmate. Hodges did not hear anything at all about Dixon until he was found dead.

¶27. Jones testified that after Dixon was taken back to the STU, he went to find Brannan. Jones told Brannan "what had just happened" and that Dixon was weak and could not dress himself or stand up. According to Jones, Brannan responded by telling him "that she didn't want to hear anything else about . . . Dixon, that people had been coming to her telling her things about him and she didn't want to hear anything else about him." Jones's shift ended shortly after, and he had no further interaction with Dixon or Brannan.

### September 24, 2014

¶28. At 6:22 a.m. on September 24, Johnson looked in Dixon's cell. Dixon was lying on the floor and appeared to be tapping the door with his fingers. Johnson thought Dixon looked worse than the last time he had seen Dixon on September 22. Johnson told Dixon that he would get the nurse when she came through for medical checks.

¶29. Brannan appeared in the hall at 7:39 a.m. Johnson told Brannan that Dixon was "really bad sick" and needed medical attention. Brannan glanced through Dixon's cell window but kept moving. Brannan came back down the hall at 8:28 a.m., and Johnson testified that he again asked her to check on Dixon. According to Johnson, Brannan said she did not have time for Dixon.

¶30. Shortly after 10 a.m., three officers walked to Dixon's cell. They looked through the cell window and called the control room to have the door opened. At 10:07 a.m., the cell door opened. When officers entered the cell, Dixon was already dead.

11

## Policies and Procedures for GCRCF

¶31.    Correctional officers assigned to the STU were required to perform a check on all STU inmates every thirty minutes.  Officers were supposed to log each inmate's movements and food intake.  Lieutenant Hodges testified that many officers were not as specific as they should have been when recording information in the logs.  Hodges testified that the officer should log anything they noted when they checked on an inmate.  Hodges testified that nothing in Dixon's log book indicated that there was anything out of the ordinary on the day he died and that some previous notations were inadequate.

¶32.    Officer Johnson testified that officers were not allowed to make any medical decisions and could not administer medicine to inmates.  If an officer believed there was something wrong with an inmate, the officer was required to call the nurse.  Johnson testified that officers were not supposed to call 911 unless an inmate was "bleeding out."  Hodges said that officers could call 911 if there was a life-threatening situation or emergency.

¶33.    Johnson testified that officers working in the STU were supposed to complete a meal log for each inmate, which would show whether the inmate had eaten, not eaten, or refused each meal.  This document was separate from the general logbook.  Brannan told Johnson to leave the meal logs on each inmate's cell door so she could read them.  Johnson did not tell Brannan that Dixon had refused food, but he recorded it on Dixon's meal log.  Dixon's log showed that he either refused or did not eat each of the meals brought to him on September 22, September 23, and September 24, when he was found dead in his cell.

### Testimony from Medical Experts

¶34.   Dr. John Brently Davis performed Dixon's autopsy and testified as an expert in forensic pathology.   Davis found no evidence of external or internal injuries or any irregularity in any of Dixon's major organs.   However, Davis found blood and a fungal infection in Dixon's esophagus, which he said was common in diabetics.  Tests also showed that Dixon's blood contained sixty times the normal level of acetone.  Davis testified that such a high level of acetone was common in people suffering from diabetic ketoacidocis (DKA).   DKA is a life-threatening condition that occurs when an insulin-dependent diabetic's glucose level gets too high due to a lack of insulin.  Davis explained that when the body functions properly, it produces insulin, which helps cells take in glucose to be used for energy.  If the cells cannot take in glucose because of a lack of insulin, the cells look for other sources of "fuel" and break down the fatty acids in the body.  The breakdown of fatty acids results in an accumulation of acetone.

¶35.   Davis testified that nausea and vomiting are symptoms of DKA in an insulin-dependent diabetic.  Other symptoms include high blood glucose, high acetone levels, thirst, and abdominal pain.  Davis testified that DKA is a medical emergency and is almost always fatal without medical intervention.

¶36.   Dixon's blood glucose level at death was greater than 500.  Davis testified that a blood glucose level higher than 200, when combined with the high levels of acetone in Dixon's blood, clearly indicated that Dixon was suffering from DKA.  Davis testified that Dixon's cause of death was complications from his diabetes.

¶37.   Davis testified that Type-1 diabetics do not produce insulin at all and that symptoms

of high glucose would appear within twelve to twenty-four hours for a Type-1 diabetic who was without insulin. Davis did not believe a Type-1 diabetic could survive four days without insulin.

¶38. Davis did not believe that any trace of drugs would have been found in Dixon's blood because Dixon had been incarcerated and had not consumed any drugs for a week prior to his death. Davis testified that if Dixon was addicted to a drug, particularly an opiate, then he would go into withdrawal without the drug in his system. Some of the symptoms of withdrawal were nausea and vomiting, similar to some of the symptoms for DKA.

¶39. Lori Roscoe testified as an expert in nursing practices and healthcare in correctional facilities. Roscoe testified that a diabetic inmate should be evaluated as soon as possible to determine his medical history, doctor, and medication schedule. In addition, the inmate's vitals and blood sugar should be checked upon admission to establish a "baseline." Roscoe said that the nurse should contact the inmate's doctor to verify his information and document all medicine the inmate received. Roscoe did not find any documentation that Brannan had followed these procedures. Roscoe testified that Brannan failed to provide sufficient medical attention because she failed to determine a "baseline" for Dixon's medical needs and failed to ensure that he was adequately monitored.

¶40. Roscoe explained that a refusal form for Dixon's insulin was never located. She testified that even if Dixon signed a refusal form, Brannan should have continued to offer him insulin. Roscoe acknowledged that Brannan could not force Dixon to test his glucose or take his insulin, but Roscoe saw no indication that Brannan ever encouraged him to do so.

14

Roscoe said that every refusal should have been documented. She also testified that Brannan's testing Dixon's blood sugar just once during his seven-day incarceration was "well below the nursing standard of care."

¶41. Roscoe testified that Dixon's history of drug use likely compounded his medical issues. Roscoe did not believe that withdrawals could explain all the symptoms that Dixon began experiencing on September 22. Roscoe opined that Dixon's symptoms warranted evaluation and intervention by a physician, not just periodic monitoring at the jail. Roscoe testified that a lack of insulin in an insulin-dependent diabetic could manifest in confusion, tremors, and slurred speech. Roscoe had seen inmates who had been arrested for intoxication when in fact they only needed insulin.

¶42. Roscoe testified that Brannan's reports about Dixon from September 22 showed that his pulse was fluctuating and that his blood pressure had experienced a "huge drop" for the two hours between Brannan's assessments. Roscoe said that the changes in Dixon's vitals and his complaints that he was unable to breathe should have made Brannan seek an evaluation by a higher-level provider.

¶43. Roscoe testified that although Brannan could not diagnose Dixon's condition, the observations that Brannan noted should have clearly indicated to her that Dixon's condition was worsening. Yet Brannan failed to take any action to determine why Dixon's condition was worsening. Roscoe testified that she was "shocked" that Brannan had not sent Dixon to the hospital when Bozeman called her in the middle of the night to report that Dixon was throwing up a black substance and complaining that he was unable to breathe. Roscoe

15

testified that Bozeman's report that Dixon's O2 level was 87% should have been a red flag because any oxygen level below 90% would require supplemental oxygen. Roscoe testified that Brannan "was operating well beyond her scope of practice as a registered nurse by" deciding not to refer Dixon to a doctor or emergency room. "[I]n essence, [Brannan] denied Mr. Dixon access to the medical care that he needed at that point in time."

¶44. Dr. Randy Easterling testified for Brannan as an expert in diabetics and family medicine. Easterling testified that Dixon appeared to be addicted to opioids and crystal methamphetamine. Easterling stated that Dixon's use of and addiction to these drugs had a "profound" effect on his body. According to Easterling, withdrawal from the two drugs is very different. A person going through opioid withdrawals would experience nausea, vomiting, and possibly some flu-like symptoms. Easterling's opioid patients had an average withdrawal time of twelve days. In contrast, crystal meth withdrawal tended to cause depression, weakness, and lethargy. Such a patient could also exhibit insomnia, paranoia, or hallucinations. Easterling testified that it was reasonable for Brannan to believe that Dixon was going through withdrawals from opioids and methamphetamine. Easterling stated that if a diabetic patient exhibited slurred speech, an inability to eat, vomiting, and weakness, he would assess them further or send them to receive emergency care, unless the patient refused. Easterling conceded that Dixon's "outcome" would have been different if he had received insulin.

### Brannan's Interview with the Mississippi Bureau of Investigation

¶45. In February 2015, Investigator James Ivory of the Mississippi Bureau of Investigation

16

interviewed Brannan. Brannan told Ivory that on the morning of his death, Dixon was standing at his cell door window and that she stopped during "med call" to ask if he was okay. Brannan told Ivory that Dixon nodded, so she told him she would come back later. Brannan said that after she completed her other rounds, she returned to the STU but did not speak to Dixon and that Johnson did not mention anything about Dixon.

¶46.    Brannan said that when she returned to her office that morning, someone told her that she was needed in the STU. Brannan told Ivory that when she first got to the cell, Dixon was sitting on the floor of the cell, leaning against the wall or toilet. Ivory pointed out that her initial report on Dixon's death said that Dixon was lying on the floor. Brannan responded that she must have misremembered.

¶47.    Brannan told Ivory that Dixon initially was placed in a detox holding area because he was high when he was arrested. She said that officers moved him to the general population after they felt he was "clean." She told Ivory that she had Dixon moved to the STU for observation because she knew that he had smoked meth recently. She also told Ivory that she placed him on a thirty-minute watch because he seemed to be "coming off some pills." Brannan said that Dixon told her that he sometimes took insulin and sometimes did not. She did not recall whether anyone brought insulin to the jail for him. She stated that her general policy for a diabetic inmate was to get the name of the inmate's doctor and then to get the inmate's medical information from the doctor.

¶48.    Brannan told Ivory that if an officer did not tell her that Dixon was not eating, then she would not know about it. She did not remember whether anyone told her that Dixon was

17

not eating. She also claimed that there were no signs that Dixon's blood sugar was high or low, though she only checked his blood sugar once.

### Brannan's Testimony at Trial

¶49. At trial, Brannan acknowledged that she had told Ivory certain things that were inaccurate or untrue. She testified that any inaccuracies were honest mistakes attributable to the passage of time between Dixon's death and the interview.

¶50. Brannan testified that she started each day by checking booking sheets to see if any of the inmates booked overnight had medications or illnesses that required her attention. Next, she checked for sick-call requests and made her rounds. She always carried blank forms with her in case an inmate requested help while she was on her rounds. Dixon testified that she discussed medicines and procedures with new inmates.

¶51. On September 18, Brannan saw that Dixon had been booked and that he was an insulin-dependent diabetic. Dixon's booking sheet did not specify what type of insulin he used, so Brannan had him pulled from his cell to discuss his condition. According to Brannan, Dixon told her that he had smoked meth on the day he was arrested and had taken pills, but he would not tell her what kind of pills. Brannan testified that Dixon told her that he did not take any medicine for his diabetes and had not seen a doctor in a year. According to Brannan, Dixon stated that he did not check his blood sugar and "took care of [him]self."

¶52. Brannan thought it was odd that Dixon refused his insulin. She said that he was the first inmate to refuse insulin. She testified that Dixon signed an insulin refusal form. However, after Dixon's death, the form could not be found. Brannan testified that she

18

explained the sick-call procedure to Dixon and told him that he could press a button in his cell if he needed medical attention.

¶53. Brannan testified that she later learned that Dixon had insulin in his car and that she asked Williams to retrieve it. Brannan also called Dixon's mother, Donna, because she was listed as his emergency contact. Donna told her that Dixon did take insulin, which he bought over-the-counter from WalMart. According to Brannan, Donna also told her that Dixon primarily managed his diabetes through his diet. Donna told Brannan that someone would bring insulin to the jail.

¶54. Brannan next saw Dixon on September 22. She was notified that an inmate was down in the shower, and officers brought Dixon to her office in a wheelchair. She checked his vitals and asked again about his medicine. Dixon agreed to let her check his blood sugar, and she saw that his blood sugar was 243. Brannan testified that Dixon told her that he had just eaten, so Brannan assumed that was why the blood sugar was high. According to Brannan, Dixon told her again that he had not taken insulin in a long time. Brannan also claimed that Dixon told her that he smoked one to two grams of meth each day and that he took some pills. Brannan testified that she asked Dixon when he had last been "clean" from meth, and he told her that he had not been clean in a long time.

¶55. Brannan testified that while she completed an assessment form[3] for Dixon, he stood up from the wheelchair and started pacing around her office. She described him as very

---

[3] Brannan testified that the assessment was called a fourteen-day assessment because it was required for inmates who stayed in the jail for more than fourteen days. However, she frequently competed the assessment before the end of the fourteen-day period.

nervous and jittery. This behavior, coupled with the fact that he had been sick recently, led Brannan to believe that he was suffering from withdrawals from meth and pills. She told him she would move him to the STU so that he could be checked every thirty minutes.[4]

¶56. Brannan testified about her other interactions with Dixon on September 22 and 23. Her testimony generally tracked her reports, as discussed above. *See supra* ¶¶16-18, 23.

¶57. Brannan testified that she always checked on Dixon when requested and always checked his vitals. She testified that she repeatedly asked Dixon if he wanted to check his blood sugar and that he repeatedly refused. She believed that Dixon was stable based on his vitals on September 22-23. Brannan stated that she would have sent Dixon to the hospital immediately if she had thought it was necessary. She stated that no one ever asked her to send Dixon to the hospital.

¶58. On Wednesday, September 24, Brannan arrived for what was generally her busiest day of the week. Brannan testified that the doctor came to the jail each Wednesday, so she tried to get through her initial med checks and sick calls before the doctor arrived. She went to the STU and saw Officer Johnson. A female inmate was in the shower, so officers had placed a tarp to block the shower from the view of the male inmates. Brannan could not reach one of the inmates due to the tarp, so she told Johnson that she would have to come back later. While she continued on her rounds, she learned that the doctor would not be coming that day. When she finished her rounds, officers were about to conduct the 10 a.m.

_____

[4] Officer Jones's testimony materially contradicted Brannan's description of her visit with Dixon. Jones testified that he stood in the doorway while Brannan met with Dixon and that Dixon never got out of his wheelchair. Jones also testified that Dixon insisted to Brannan that he was not experiencing withdrawals. *See supra* ¶¶13-14.

inmate count, so she went to her office to wait for the count to end. Officer Davis came to her office and told her she was needed in the STU.

¶59. When Brannan reached Dixon's cell, she saw Dixon on the floor. She told officers to call the warden, the sheriff, and 911. She checked for Dixon's pulse and found none. His skin was cold. She did not recall performing CPR, but she did place her hand on his chest. Some reports indicated that she had performed CPR, but she did not believe that she had done so because Dixon was obviously dead.

¶60. The warden arrived and told her to complete an incident report. She returned to her office, completed a report, and then gave the warden all her paperwork regarding Dixon. Two days later, she was summoned to the warden's office and suspended pending the results of Dixon's autopsy. Her employment was later terminated.

¶61. On cross-examination, Brannan testified that if an inmate told her that he could take care of himself, she could only go by what he said. She acknowledged that she had special training for insulin-dependent patients, but she said that every patient was different. She testified that Dixon did not tell her whether he was a Type-1 or Type-2 diabetic, but she admitted that she did not ask. She only asked about his medicine and diet. She did not remember whether Donna Dixon had told her that Dixon was Type-1 diabetic. She testified that someone must have told her that Dixon saw a Dr. Patel because she wrote "Dr. Patel" on Dixon's booking sheet. However, she did not try to contact Dr. Patel.

¶62. Brannan denied that she ever saw Dixon at a time when he was unable to talk; however, all other witnesses who saw Dixon on September 23 testified that he was not alert

21

and was slurring his words. Brannan denied any knowledge of the September 23 incident in which officers had to hold Dixon up as he spoke to Busby on the phone about drug court. Brannan claimed that if she had been aware of that incident, she would have sent Dixon to the hospital. She denied that Officer Jones told her about the incident. However, Jones testified that he did. Brannan did admit that she told Officer Erkhart that Dixon was faking his symptoms. Brannan claimed that any of the officers could have sent Dixon to the hospital or called a doctor if they thought it was necessary.

¶63. The district attorney asked Brannan why it appeared in surveillance video from September 24 that she was signing inmates' logbooks without actually speaking to or checking on the inmates. She stated that she always moved quickly on sick calls on Wednesday because the doctor would be in later. She also stated that she did not always read the logbooks carefully because she relied on the officers to tell her about any significant issues. She did not recall Officer Johnson asking her to check on Dixon on the day of his death, and she did not know why she did not look at Dixon's chart that day. She assumed she skipped it because she knew that she would be back in the STU later.

¶64. Finally, Brannan testified that she had given the warden the following documents: the fourteen-day assessment, which she said was stapled to the booking sheet; a diet sheet; a refusal form indicating that Dixon refused insulin; and her incident reports from September 22 and 23. Only the incident reports and the booking sheet were ever found. The other documents, which might have supported Brannan's claims, were missing.

¶65. The jury was instructed on the elements of "misdemeanor manslaughter," Miss. Code

Ann. § 97-3-29, and the underlying misdemeanor of "maltreatment," i.e., failing to provide sufficient medical attention to an inmate, Miss. Code Ann. § 47-1-27. The jury found Brannan guilty of manslaughter, and the court sentenced her to serve fifteen years in the custody of the Department of Corrections. Brannan filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

**ANALYSIS**

¶66. Brannan raises five general issues on appeal, along with a number of sub-issues.[5] First, Brannan argues that her indictment was vague and confusing and "charged [her] with a crime that does not exist." Second, Brannan argues that the maltreatment statute is unconstitutionally vague. Third, she argues that the trial court abused its discretion by excluding Dixon's medical records, limiting the testimony of one of his doctors, and excluding certain evidence related to his arrest. Fourth, Brannan argues that the trial court abused its discretion by admitting a summary chart of a surveillance video. Fifth, Brannan argues that the State presented insufficient evidence to support her conviction and that the jury's verdict was against the overwhelming weight of the evidence. For the reasons discussed below, we find no reversible error and affirm.

**I.     The indictment was not defective.**

¶67. Brannan alleges a number of defects in her indictment, which charged her with

---

[5] Brannan's statement of issues, M.R.A.P. 28(a)(3), lists eleven issues, several of which overlap. Brannan addresses ten of those issues in some fashion in the argument section of her opening brief. However, she fails to address her eleventh issue—whether the trial court erred by admitting surveillance video from the jail and by refusing a spoliation instruction—in the argument section of her brief. Therefore, that issue is waived. *Arrington v. State*, 267 So. 3d 753, 756 (¶8) (Miss. 2019).

"misdemeanor manslaughter" under Mississippi Code Annotated section 97-3-29. The indictment specifically alleged:

> [Brannan] did feloniously and without authority of law kill [Dixon], while engaged in the commission of the misdemeanor crime of Maltreatment in violation of Mississippi Code Annotated Section 47-1-27 . . . , by willfully failing to provide sufficient medical attention to [Dixon], who was at the time . . . a prisoner at [GCRCF], when [Brannan] was under a duty to provide sufficient medical attention as the nurse of [GCRCF], and by culpable negligence in failing to provide sufficient medical attention did thereby unlawfully and feloniously kill [Dixon], without malice . . . .[6]

¶68. Brannan's indictment is consistent with the relevant statutes. First, as relevant here, Mississippi Code Annotated section 97-3-29 provides that a killing "shall be manslaughter" when it is committed "without malice" but "by the . . . culpable negligence" of a person who "is engaged in the perpetration of any . . . misdemeanor." Second, as relevant here, Mississippi Code Annotated section 47-1-27 makes it a misdemeanor for any employee who has "custody of any county prisoner" to fail "to provide sufficient . . . medical attention" to such prisoner.

### A. The indictment's heading does not render it defective.

¶69. Brannan first argues that her indictment "was vague, confusing, and charged [her] with a crime that does not exist" because the heading identified the charge as "Misdemeanor Manslaughter." Brannan argues that the heading was confusing and a "curious mischaracterization" because manslaughter is a "serious felony," not a misdemeanor.

---

[6] The indictment originally alleged that Brannan killed Dixon "willfully." The State later moved to amend the indictment to delete the word "willfully" from the first and last lines of the above-quoted passage. The State argued the word was mere "surplusage" and a scrivener's error. The trial court granted the motion, and Brannan does not raise the amendment to the indictment as an issue on appeal.

Brannan cites no authority for this argument or anything to suggest that the grand jury or jury was confused or misled by the term "Misdemeanor Manslaughter." At trial, the jury was instructed specifically that Brannan was "charged in the indictment for the felony crime of Misdemeanor Manslaughter." The official title of the offense is "Homicide; killing while committing a misdemeanor," Miss. Code Ann. § 97-3-29, but it is also commonly referred to as "misdemeanor manslaughter." The indictment's use of the common term does not render it defective. This issue is without merit.

### B. The indictment sufficiently alleges the essential elements of the crime.

¶70. Brannan next argues that her indictment did not include enough factual allegations to inform her of the nature of the charges against her. She argues that the indictment should have alleged with specificity how she failed to provide sufficient medical attention.

¶71. A criminal defendant has a constitutional right to be informed of the nature and essence of the charges against her. *See* Miss. Const. art. 3, § 26. "The purpose of the indictment is to furnish the accused such a description of the charges against [her] as will enable [her] to adequately prepare [her] defense." *Fulton v. State*, 146 So. 3d 975, 977 (¶6) (Miss. 2014) (quotation marks omitted). "Essentially, nothing more than a concise and clear statement of the elements of the crime charged is required." *Mixon v. State*, 921 So. 2d 275, 280 (¶13) (Miss. 2005) (quotation marks omitted); *accord* MRCrP 14.1(a)(1) ("The indictment upon which the defendant is to be tried shall be a plain, concise and definite written statement of the essential facts and elements constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation.").

¶72. Brannan's indictment references and tracks the relevant statutes. *See supra* ¶¶67-68. In addition, the indictment makes clear that Brannan was charged with killing Dixon by culpable negligence and while engaged in the misdemeanor of maltreatment, which is to say that she willfully failed to provide sufficient medical attention to Dixon while he was an inmate under her care at GCRCF. This indictment tracked the language of the manslaughter statute and the maltreatment statute, and as such it was sufficient to put Brannan on notice of the charges against her. *See Graves v. State*, 216 So. 3d 1152, 1158 (¶12) (Miss. 2016); *Johnson v. State*, 475 So. 2d 1136, 1139 (Miss. 1985).

¶73. Moreover, "[i]n an indictment for homicide it shall not be necessary to set forth the manner in which or the means by which the death of the deceased was caused . . . ." Miss. Code Ann. § 99-7-37(1) (Rev. 2015). Rather, "[i]t shall be sufficient, in an indictment for manslaughter, to charge that the defendant did feloniously kill and slay the deceased . . . ." *Id.*; *see also Edwards v. State*, 755 So. 2d 443, 445-46 (¶7) (Miss. Ct. App. 1999) ("[T]he indictment in this case was uninformative as to what action or inaction on the part of these defendants constituted the culpable negligence that proximately caused [the victim's] death. . . . [H]owever, the statute regarding homicide indictments specifically permits a charge to be brought in this manner.").

¶74. Brannan argues that our Supreme Court's decision in *State v. Berryhill*, 703 So. 2d 250 (Miss. 1997), requires a greater degree of specificity in her indictment. In *Berryhill*, the Court held that "capital murder indictments that are predicated on burglary are required to state the underlying offense to the burglary." *Id.* at 255 (¶23). The Court emphasized that

26

"[b]urglary is unlike robbery and all other capital murder predicate felonies in that it requires as an essential element the intent to commit another crime." *Id.* at 256 (¶24). The Court acknowledged that "the general rule" is that "indictments that track the language of the criminal statute [are] sufficient." *Id.* However, the Court held that "the fairer rule in the case of capital murder arising out of burglary" would be to "require the indictment to name the crime underlying the burglary in addition to tracking the capital murder statute." *Id.* The Court reasoned that allowing the State to charge burglary as an essential element of capital murder without identifying the crime underlying the burglary could require a defendant to defend himself against "hundreds of crimes in the course of his burglary." *Id.* at (¶26). The Court also reasoned that an ordinary indictment for burglary must identify the underlying crime, and there was no reason to require any less in a capital murder case. *Id.*

¶75. Brannan's analogy to *Berryhill* is unpersuasive. Brannan's indictment specifically identified not only the underlying misdemeanor (maltreatment) but also the type of maltreatment (failure to provide sufficient medical attention). Unlike the indictment in *Berryhill*, Brannan's indictment did not fail to disclose any underlying crime or essential element of the offense. In this case, the applicable rule is "the general rule" that "indictments that track the language of the criminal statute [are] sufficient." *Id.* at (¶24). Accordingly, Brannan's indictment was sufficient, and this argument is also without merit.

### C. The indictment does not charge a legal impossibility.

¶76. Brannan next argues that the indictment charged her with a nonexistent or "legally impossible" crime because it required the jury to find that she acted both "willfully" (i.e.,

27

intentionally) and with "culpable negligence." However, Brannan is mistaken. The allegations of the indictment are entirely consistent.

¶77. What Brannan's argument ignores is that "willfully" and "culpable negligence" describe different things in the indictment. "Willfully" simply means "intentionally." *See, e.g.*, *Moore v. State*, 676 So. 2d 244, 246 (Miss. 1996) ("'[W]illful' means nothing more than doing an act intentionally."). The indictment alleges that Brannan intentionally failed to provide sufficient medical attention to Dixon—*not* that she intentionally killed him. The indictment then alleges that Brannan's intentional failure to provide sufficient medical attention rose to the level of criminally "culpable negligence," which is "defined as the conscious and wanton or reckless disregard of the probabilities of fatal consequences to others as the result of the willful creation of an unreasonable risk." *Campbell v. State*, 285 So. 2d 891, 893 (Miss. 1973).[7] That is, by intentionally failing to provide sufficient medical attention, Brannan consciously disregarded an unreasonable risk of fatal consequences. There is no contradiction or inconsistency in the indictment.[8]

## II. The maltreatment statute is not unconstitutionally vague.

---

[7] The jury was instructed using *Campbell*'s definition of culpable negligence.

[8] The Supreme Court made a similar point in *Williams v. State*, 161 Miss. 406, 409-10, 137 So. 106, 107 (1931), *overruled on other grounds by State v. Buckhalter*, 119 So. 3d 1015, 1018-19 (¶¶11-13) (Miss. 2013). In *Williams*, the Court held that an indictment under the general culpable negligence manslaughter statute was not defective for alleging that the defendant killed the victim both "willfully and feloniously" and "by culpable negligence." *Id.* The Court held that the term "willfully" could be treated as mere "surplusage" or, in the alternative, the indictment should be read as charging the defendant "with intentionally doing the thing which constitutes his culpable negligence, but not with the intention of inflicting the injury resulting therefrom." *Id.*

28

¶78.	Brannan next argues that the maltreatment statute, Miss. Code Ann. § 47-1-27, is unconstitutionally vague and violates due process because the term "sufficient and wholesome . . . medical attention" is neither defined by statute nor readily understandable. In addressing this argument, we begin with the proposition that subject to constitutional limitations, "the power to create and define criminal offenses rests exclusively within the authority of the Legislature." *Wilcher v. State*, 227 So. 3d 890, 895 (¶28) (Miss. 2017).  In addition, "all due process requires is that the law give sufficient warning that people may conform their conduct so as to avoid that which is forbidden." *Id.* at 896 (¶29) (quotation marks and brackets omitted).  A statute is unconstitutionally vague only if it "forbids or requires the doing of an act in terms so vague that persons of common intelligence must guess at its meaning." *Id.* (quotation marks omitted).  "[T]he test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Fulgham v. State*, 47 So. 3d 698, 701 (¶8) (Miss. 2010) (alteration omitted) (quoting *Jordan v. De George*, 341 U.S. 223, 231-32 (1951)).

¶79.	In analyzing Brannan's claim of vagueness, we "must first consider whether the [maltreatment] statute affects a constitutional right" belonging to Brannan. *Id.* at 703 (¶13) (citing *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 548 (5th Cir. 2008)).  The statute does not implicate any constitutional right, as there is no constitutionally protected interest in withholding medical attention from prisoners.  When, as in this case, "the statute implicates no constitutionally protected right, [we] consider whether the statute is impermissibly vague in all of its applications, applying the statute to [Brannan's] conduct

29

*before* considering any hypothetical scenarios." *Id.* We "must consider whether [Brannan] had notice of what conduct [was] prohibited and whether law enforcement had definite standards to avoid arbitrary enforcement." *Id.*

¶80. Brannan was the only registered nurse at GCRCF and the highest medical authority present during Dixon's incarceration. She knew that Dixon had complained of being unable to breathe, that his vital signs varied over the course of two days, that he had not eaten, and that he used insulin to manage his diabetes. She knew that he had been found on the floor of the shower and that he had thrown up black liquids. She also knew that he had used methamphetamine and some unknown pills in the days leading up to his arrest. She decided not to have Dixon taken to a hospital or a doctor. Rather, she took it upon herself to diagnose him as suffering from withdrawals. In addition, she told guards who were concerned about Dixon that he was only "faking" and that he was fine.

¶81. We address the weight and sufficiency of the evidence against Brannan in greater detail *infra*, but for purposes of her constitutional challenge to the statute, it is sufficient to say that a nurse of ordinary intelligence should be able to read the statute and understand that it prohibits the sort of failure to provide medical attention that is alleged in this case. That is, it prohibits a nurse from repeatedly ignoring signs that a diabetic prisoner is experiencing a life-threatening medical condition, and it prohibits her from exceeding her authority as a nurse and denying the prisoner medical care from a physician or hospital. Thus, the maltreatment statute is not vague or unconstitutional as applied to Brannan.

    **III.    The trial judge did not abuse his discretion by excluding evidence offered by Brannan.**

30

¶82.    Brannan argues that the trial court abused its discretion by excluding various medical records, by limiting the testimony of one of Dixon's treating physicians, and by excluding evidence related to Dixon's arrest.  Brannan argues that the exclusion of this evidence effectively denied her a fair trial by limiting her defense.

¶83.    "A criminal defendant is entitled to present his defense to the finder of fact, and it is fundamentally unfair to deny the jury the opportunity to consider the defendant's defense where there is testimony to support the theory." *Edmonds v. State*, 955 So. 2d 787, 798 (¶29) (Miss. 2007); *see also Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007) ("[T]he Due Process Clause prohibits a State from punishing an individual without first providing that individual with an opportunity to present every available defense." (quotation marks omitted)).  "While a defendant is entitled to present his defense, the right is not without its limitations, as all evidence admitted in support of the defendant's theory of the case must comport with the Mississippi Rules of Evidence." *Scott v. State*, 231 So. 3d 1024, 1031 (¶12) (Miss. Ct. App. 2016) (quotation marks omitted), *aff'd by an evenly divided Court*, 231 So. 3d 995 (Miss. 2017).

¶84.    "Irrelevant evidence is not admissible." M.R.E. 402.  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the case." M.R.E. 401.  The trial court has discretion to exclude even "relevant evidence if its probative value is substantially outweighed by a danger of," inter alia, "confusing the issues" or "misleading the jury." M.R.E. 403.  "A trial court has great latitude in admission or exclusion of evidence where

31

the question is one of materiality or relevancy, and its decision should only be reversed where this discretion is abused." *Blocker v. State*, 809 So. 2d 640, 645 (¶20) (Miss. 2002) (citing *Eskridge v. State*, 765 So. 2d 508, 510 (¶7) (Miss. 2000)). In addition, to warrant reversal based on the exclusion of evidence: "two elements must be shown: error and prejudice to the party appealing." *Gray v. State*, 799 So. 2d 53, 61 (¶30) (Miss. 2001). In other words, "[w]e will not reverse a conviction based on a harmless error." *Chaupette v. State*, 136 So. 3d 1041, 1047 (¶12) (Miss. 2014).

### A. The trial judge did not abuse his discretion by excluding certain parts of Dixon's medical records.

¶85. Brannan argues that the trial court abused its discretion by granting a motion in limine to exclude Dixon's medical history because the records were relevant. Brannan argues that the medical records were relevant to show Dixon's state of health at the time of his death, as well as his medical conditions prior to incarceration. She also argues that the records vary as to whether Dixon was a Type-1 or Type-2 diabetic, creating uncertainty about whether he was truly an insulin-dependent diabetic.

¶86. Brannan argues that medical records from Community Medical Center would have shown that some of the symptoms Dixon experienced during his incarceration were similar to symptoms that he experienced during prior drug withdrawals. She says the records would also show that Dixon did not regularly take his insulin. Brannan argues that medical records from South Central Regional Medical Center would have shown that Dixon had previously denied being diabetic, that he did not comply with his diabetes treatment, and that he disregarded medical advice related to his diabetes. The State argues that the records are

32

irrelevant because Brannan did not have knowledge of them when Dixon was under her care. The trial judge excluded the records as irrelevant.

¶87.  The trial judge did not abuse his discretion.  There is no evidence that Brannan was aware of any of the information contained in these records.  What Brannan did know, according to Officer Jones's testimony, was that when she suggested to Dixon that he was only suffering from withdrawals, Dixon told her that he had been through withdrawals before and that he was *not* going through withdrawals.  Brannan also knew that Dixon kept insulin in his car and that his mother felt that his diabetes was serious enough that she purchased and brought insulin to the jail.  Brannan also knew Dixon had been unable to eat, and yet his blood sugar level was high.

¶88.  The fact that Dixon refused his insulin or did not report his diabetes to a medical professional on some other occasion is irrelevant to Brannan's knowledge and treatment of Dixon during his incarceration.  Likewise, the symptoms that Dixon exhibited during prior withdrawals from drugs are also irrelevant.  Brannan was unaware of that information when she treated Dixon, and Dixon himself told her that the symptoms were *not* similar.  The trial judge did not abuse his discretion in excluding the medical records.

**B.  The trial judge did not abuse his discretion by excluding Dr. Hoover's records and limiting Dr. Hoover's testimony.**

¶89.  Brannan argues that the trial judge erred by limiting the testimony of Dr. Rick Hoover and by excluding related medical records.  Dr. Hoover treated Dixon for drug addiction several months before Dixon died.  Brannan argues that Hoover's records and testimony

about Dixon's treatment could have shown that Dixon did not tell Hoover about his diabetes or his use of insulin, that Dixon's withdrawal symptoms were similar to the symptoms he experienced before death, and that Dixon used illegal drugs and had experienced withdrawal symptoms before. The State argues that the trial judge properly excluded this evidence because, like the medical records from the two hospitals, it was irrelevant.

¶90. We begin with some additional context for the trial judge's ruling. Thirteen days before trial, Brannan filed a motion requesting a subpoena duces tecum for Hoover's records of Dixon's treatment. At a hearing the next day, Brannan asked the court to take up her motion, but the trial judge declined because he had not received a copy of the motion. A few days later, Brannan subpoenaed Hoover's records in a civil wrongful death suit pending in federal court. Subsequently, after the jury had been impaneled, the trial judge heard the State's motion in limine to exclude the records obtained from Hoover.

¶91. The State argued that the records should be excluded because they were irrelevant. In addition, the State argued that Brannan's attorneys violated the Mississippi Rules of Criminal Procedure by obtaining the medical records without an order from the trial judge. Brannan's attorneys responded that the records were relevant and had been obtained lawfully in the civil case. The trial judge stated that he would exclude the records "based primarily on the procedural aspect."

¶92. The trial judge erred to the extent that he excluded the records solely because Brannan obtained them through a subpoena in the civil case. Rule 33(c) of the Mississippi Rules of Criminal Procedure provides that a party must obtain the court's permission before issuing

34

a subpoena to require the production of documents prior to trial. MRCrP 33(c). However, Brannan ultimately obtained the documents without a subpoena under Rule 33(c), and Rule 33(c) does not prohibit the use of evidence lawfully obtained through other means.

¶93. However, Hoover's records were irrelevant for the same reasons as Dixon's other medical records. The information in the records was not known to Brannan when she treated Dixon, and the fact that Dixon did not disclose his diabetes to a different medical provider in the past had no bearing on Brannan's duty to provide sufficient medical care based on the information known to her. Accordingly, the trial judge did not abuse his discretion by excluding the records.

¶94. As to the limitation of Hoover's testimony, the trial judge ruled that Hoover could testify that he treated Dixon as a patient and that Dixon denied being diabetic. The judge ruled that Hoover could not testify about Dixon's drug addiction. Hoover testified that he treated Dixon for six months and that Dixon never disclosed that he was diabetic.

¶95. The trial judge's limitation of Hoover's testimony was consistent with the judge's rulings on Dixon's medical records. Brannan did not know anything about Dixon's symptoms during prior withdrawals. Accordingly, the trial judge did not abuse his discretion by limiting Hoover's testimony on the grounds of relevance.

### C. The trial judge did not abuse his discretion by excluding details of Dixon's arrest.

¶96. Brannan argues that she should have been allowed to show that Dixon admitted to arresting officers that he had smoked meth on the day of his arrest, that he did not tell the officers about his insulin, and that he denied having insulin. Brannan points out that the State

35

disputed her claim that Dixon told her that he had smoked meth or taken pills on the day of his arrest (*see supra* ¶16 & n.2), and she argues that the police report would have corroborated her testimony. In response, the State points out that Brannan was allowed to present evidence that Dixon was arrested for possession of meth and that he had been addicted to both meth and opioids. The State also argues that the arrest report does not mention insulin at all and, thus, does not corroborate Brannan's testimony.

¶97. The trial judge entered an order in limine that prohibited the parties "from mentioning specific details of [Dixon's] arrest . . . , field sobriety testing administered to [Dixon], the details of the investigation of the drug charge to include the quantity of methamphetamine located inside [Dixon's] vehicle, and other such related information." However, the order provided that the parties could elicit testimony that Dixon was arrested and charged with possession of a controlled substance, DUI, child endangerment, and other offenses. The order further stated that if the parties believed that additional evidence regarding Dixon's arrest had "becom[e] relevant for impeachment or other purposes," they should inform the court "so that a hearing [could] be held outside the presence of the jury." Based on the court's ruling, the jury heard evidence of Dixon's arrest and the charges against him. In addition, Dixon's mother testified that he had a drug problem, and Easterling testified that Dixon used a gram or more of meth per day and had an opioid use disorder.

¶98. Thus, Brannan was permitted to show that Dixon had a drug problem and possessed meth at the time of his arrest. Indeed, those points were undisputed. Under the circumstances, we cannot say that the trial judge abused his discretion by ruling that the

precise amount of drugs in Dixon's possession at the time of his arrest was irrelevant. Moreover, given all the evidence that was admitted, we cannot see how Brannan was prejudiced by the exclusion of testimony on that specific fact.

¶99. Brannan also argues that Dixon "told the arresting officers he didn't have any insulin" and "did not ask any arresting officers to get insulin for him." However, Brannan's brief cites only the arrest report for these assertions, and the arrest report simply does not mention insulin. Thus, the arrest report says nothing relevant regarding insulin.

¶100. The arrest report does state Dixon admitted smoking meth on the day of his arrest, which corroborates Brannan's September 22 incident report and her testimony at trial. *See supra* ¶16 & n.2. Thus, the arrest report also contradicts the State's interpretation of Brannan's incident report—i.e., that Dixon last used meth six days before his arrest. *See id.* Dixon's statement within the arrest report was arguably relevant to this dispute of fact.[9] However, Brannan did not raise this specific issue or make this specific argument in the trial court. Therefore, the trial court was never called upon to rule on this specific issue. "A trial judge cannot be put in error on a matter which was never presented to him for decision." *Methodist Hosps. of Memphis v. Guardianship of Marsh*, 518 So. 2d 1227, 1228 (Miss. 1988).

¶101. As noted above, the trial judge ordered that if any testimony regarding Dixon's arrest became "relevant for impeachment or other purposes" during trial, then the parties should inform the judge "so that a hearing [could] be held outside the presence of the jury."

---

[9] Dixon's statements within the arrest report raise an issue of hearsay within hearsay. However, neither party addressed that issue in the trial court or on appeal.

However, Brannan never raised the specific issue of the admissibility of Dixon's statement to the arresting officers, nor did she make a proffer as to its alleged relevance. *See Brown v. State*, 338 So. 2d 1008, 1009-10 (Miss. 1976) (stating that counsel must advise the trial judge of "what is [expected] to be proved" by excluded evidence); *see also Bennett v. State*, 76 So. 3d 736, 743 (¶¶25-26) (Miss. Ct. App. 2011) (affirming the trial judge's ruling excluding evidence because the defense made "[n]o attempt . . . to revisit the issue of admissibility" based on subsequent developments during trial); *United States v. Ballis*, 28 F.3d 1399, 1406 (5th Cir. 1994) ("[E]xcluded evidence is sufficiently preserved for review when the trial court has been informed as to what counsel intends to show by the evidence and why it should be admitted . . . ."). Accordingly, we conclude that Brannan waived any issue with respect to Dixon's statement to the arresting officers.

## IV. The trial judge did not abuse his discretion by admitting the State's summary chart.

¶102. Brannan argues that the trial judge erred by admitting a chart prepared by the prosecution that summarized the content of a four-hour surveillance video of the STU on September 24, the day that Dixon was found dead in his cell.[10] Brannan argues that chart's entries are not supported by witness testimony or the video itself.[11]

---

[10] On appeal, the State mistakenly asserts that the chart (State's Exhibit 2) was not admitted into evidence at trial. In fact, State's Exhibit 2 was admitted into evidence over Brannan's objection. A different summary chart—State's Exhibit 1, a timeline of events that occurred between September 17 and September 23—was not admitted into evidence and was used only as a demonstrative exhibit. On appeal, Brannan does not raise any issue with respect to State's Exhibit 1.

[11] For example, the chart states that an officer can be seen "talking to Dixon" at 6:50 a.m., but the officer did not testify at trial, and it is not apparent from the video that he was

38

¶103. Mississippi Rule of Evidence 1006 permits a party to "use a summary [or] chart . . . to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Under Rule 1006, the summary may be admitted as evidence. M.R.E. 1006 advisory committee note. The trial judge has discretion to admit a summary, and we review the trial judge's decision only for an abuse of discretion. *Farris v. State*, 764 So. 2d 411, 433 (¶82) (Miss. 2000).

¶104. In this case, the trial judge did not abuse his discretion by allowing the State to use the chart during trial or by admitting the exhibit into evidence. The video was also admitted into evidence, and significant parts of the video were played for the jury during trial. Brannan had the opportunity during trial to point out any alleged errors in the chart. Moreover, Brannan fails to identify any specific way in which the chart prejudiced her defense. *See United States v. Fechner*, 952 F.3d 954, 960 (8th Cir. 2020) (holding that any error in the admission of a chart summarizing videos was harmless because the videos were admitted into evidence, the jury viewed relevant parts of the videos, and the chart's "brief descriptions of [the] videos" "did not affect [the defendant's] substantial rights"). Under these circumstances, we cannot say that the trial judge abused his discretion or that the chart prejudiced Brannan in any way.

**V. The trial judge did not err by denying Brannan's motion for judgment notwithstanding the verdict or abuse his discretion by denying Brannan's motion for a new trial.**

¶105. Brannan argues that there was insufficient evidence to support her conviction and that

---

"talking to Dixon."

the jury's verdict was against the overwhelming weight of the evidence. Specifically, Brannan argues that the State did not prove that her actions caused Dixon's death. She also argues that the State failed to prove that she willfully failed to provide sufficient medical attention or that her failure rose to the level of criminally culpable negligence.

¶106. On appeal, Brannan primarily challenges the denial of her post-trial motion for judgment notwithstanding the verdict (JNOV). A motion for JNOV "challenges the sufficiency of the evidence." *Little v. State*, 233 So. 3d 288, 291 (¶16) (Miss. 2017). We review the denial of a motion for JNOV de novo. *Haynes v. State*, 250 So. 3d 1241, 1244 (¶6) (Miss. 2018). However, we must accept all credible evidence of guilt as true and grant the State all reasonable inferences that can be drawn from the evidence. *Id.* We will reverse and render only if the evidence is such that reasonable jurors could not have found the defendant guilty beyond a reasonable doubt. *Id.* We must affirm the conviction if "*any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*" *Id.* (emphasis added) (quoting *Shelton v. State*, 214 So. 3d 250, 256 (¶29) (Miss. 2017)).

¶107. Brannan also challenges the denial of her post-trial motion for a new trial. A motion for a new trial "challenges the weight of the evidence." *Little*, 233 So. 3d at 291 (¶16). We review the trial judge's denial of a motion for a new trial only for an abuse of discretion. *Id.* at 292 (¶21). We "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* at 289 (¶1). We do not

40

"assume[] the role of juror on appeal. We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.*

¶108. The State's burden at trial was to prove that Brannan caused Dixon's death "without malice" but by her "culpable negligence" while Brannan was engaged in the commission of the misdemeanor offense of maltreatment. Miss. Code Ann. § 97-3-29. In addition, to prove the underlying offense of maltreatment, the State was required to prove that Brannan was an employee of GCRCF, that Dixon was an inmate in the custody of GCRCF, that Brannan was under a duty to provide sufficient medical attention to Dixon, and that Brannan willfully failed to furnish sufficient medical attention. Miss. Code Ann. § 47-1-27.

¶109. Brannan acknowledges that the official cause of death was "complications from diabetes mellitus," but she argues that the State's expert was unable to testify specifically regarding the effects of Dixon's drug usage or how long Dixon could survive without insulin. Brannan also argues that there was no testimony to show what could or would have been done at the hospital to prevent Dixon's death. She contends that the State was required to "prove that Dixon would have lived if he had been sent to a hospital" because the State's theory was that Brannan's failure to send Dixon to a hospital caused his death.

¶110. Dr. Davis testified that DKA is fatal if it is not properly treated. However, he testified that with proper treatment, DKA is fatal in only five to ten percent of cases. Davis testified that the symptoms that Dixon exhibited beginning on September 22 were warning signs for DKA, that "DKA is a medical emergency," and that a patient experiencing DKA should go

41

to the hospital. A document from the American Diabetes Association, which was admitted into evidence at trial, likewise identified Dixon's symptoms as warning signs for DKA and urged a person experiencing "any" of those symptoms to "contact your health care provider IMMEDIATELY, or go to the nearest emergency room of your local hospital."

¶111. Moreover, even if Brannan thought that Dixon was not insulin-dependent and was capable of managing his diabetes through his diet, Brannan knew or should have known that Dixon was unable to keep any food down on September 22 and September 23—if not longer. Brannan's own report reflects that Dixon told her on September 22 that he had been throwing up the food he ate but that he had not told anyone until that day. In addition, food logs from the STU on September 23 show that Dixon refused or did not eat all of his meals on that day. Brannan also knew that Dixon could not even keep down water or coffee.

¶112. Brannan's report from the one time that she did check Dixon's blood sugar, on September 22, indicated that his blood sugar level was 243. Brannan's expert, Dr. Easterling, conceded that 243 is "high," but he stated that "243 is not, in most cases, an emergency." Easterling explained that if a patient with a blood sugar level of 243 or even 300 "look[s] okay" and "feel[s] okay" and "if their exam is normal," then he would "send [the] patient[] home." In this case, however, the State presented substantial evidence that Dixon did *not* look or feel "okay" and that his examination was *not* "normal." As discussed above, the evidence showed that Dixon was unable to keep food or water down, unable to walk, and complained that he was unable to breathe. Easterling also assumed that Dixon's high blood sugar level could be explained by the fact that he had recently eaten. However, the evidence

42

did not support that assumption. Rather, Dixon had been unable to keep food down on September 22, if not longer.[12]

¶113. In addition, Roscoe, the State's expert in nursing practices and correctional healthcare, testified that based on the symptoms that Dixon exhibited and the information available to Brannan at the time, Brannan should have referred Dixon to a hospital for a higher level of medical treatment. Roscoe also testified that Brannan exceeded her authority by diagnosing Dixon—incorrectly—and thereby denying him access to a medical professional who was actually qualified to make such a diagnosis. Even Brannan's own expert, Dr. Easterling, testified that a diabetic patient experiencing the symptoms Dixon reported should be sent to an emergency room for evaluation.

¶114. Our Supreme Court has stated time and again that "[i]t is not our job as an appellate court to ask whether *we* believe that the evidence at trial established guilt beyond a reasonable doubt but instead, the relevant inquiry is whether after reviewing the evidence in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt." *Cotton v. State*, 144 So. 3d 137, 142 (¶8) (Miss. 2014) (emphasis added) (quotation marks and brackets omitted); *see also Jones v. State*, 95 So. 3d 641, 647 (¶20) (Miss. 2012) ("[T]his Court will not pass upon the credibility of witnesses and, where the evidence justifies a verdict, it must be accepted as having been found worthy of belief." (quotation marks omitted)). In this case, accepting the

---

[12] Easterling assumed that Dixon had just eaten based on a typed statement that Brannan provided to Ivory in April 2015. However, Brannan's contemporaneous incident reports reflect that Dixon had been unable to keep food down. Officer Jones also testified that Dixon and other inmates told him that Dixon had been unable to keep food down.

43

State's evidence as true, and granting the State all reasonable inferences, a rational jury could have found that Brannan failed to provide Dixon sufficient medical treatment and that her failure caused his death.

¶115. Brannan also argues that the State failed to prove that she "willfully" failed to provide sufficient medical attention or that she acted with "culpable negligence." As discussed above (*supra* ¶77), there is no inconsistency in these two elements. The State was required to prove both that Brannan "willfully" failed to prove sufficient medical attention to Dixon and that her failure amounted to a "conscious and wanton or reckless disregard of the probabilities of fatal consequences to others as the result of the willful creation of an unreasonable risk." *Campbell*, 285 So. 2d at 893 (defining "culpable negligence"). We conclude that the State presented sufficient evidence for a rational jury to so find.

¶116. The evidence discussed above permitted a rational jury to find that Brannan knew that Dixon was exhibiting the symptoms of a life-threatening condition and yet failed to send him to a medical provider qualified to diagnose and treat the condition. In addition, co-workers testified that Brannan had a history of ignoring inmates' medical complaints and attributing such complaints to drug withdrawals. Brannan did the same in this case, telling officers that Dixon was just detoxing or "faking." According to Jones's testimony, she did so even though Dixon tried to tell her that the symptoms he was experiencing were different from his prior drug withdrawals. This evidence is sufficient for the jury to have found that Brannan made a deliberate decision not to provide sufficient medical attention to Dixon and, further, that her decision demonstrated a conscious disregard of a life-threatening risk.

44

¶117. On appeal, Brannan only briefly asserts that she is entitled to a new trial because the jury's verdict is against the overwhelming weight of the evidence. As noted above, when we consider such a claim on appeal, we do not reweigh the evidence or reevaluate the witnesses' credibility. *Little*, 233 So. 3d at 289 (¶1). Moreover, we review the trial judge's denial of a new trial only for an abuse of discretion. *Id.* at 292 (¶21). For the reasons discussed above, we cannot say that the verdict was against the overwhelming weight of the evidence, that to allow the verdict "to stand would sanction an unconscionable injustice," or that the trial judge abused his discretion by denying a new trial. *Id.* at 289 (¶1).

## CONCLUSION

¶118. Brannan's indictment was valid and sufficient, and the statutes under which she was indicted and convicted are constitutional. Brannan received a fair trial, and the trial judge committed no abuse of discretion or reversible error in his rulings admitting or excluding evidence. Finally, the State presented sufficient evidence to sustain Brannan's conviction, and the jury's verdict is not against the overwhelming weight of the evidence.

¶119. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD AND McCARTY, JJ., CONCUR. LAWRENCE, J., NOT PARTICIPATING.**